IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TOBEONKA DESCOTT, | ) | CASE NO. 1:16CV1271 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Tobeonka Descott ("Descott") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 11.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Descott filed applications for DIB and SSI on January 16 and 23, 2013, respectively,

alleging a disability onset date of December 13, 2012.  Tr. 220, 225, 280.  She alleged disability

based on the following: fibromyalgia, carpal tunnel, depression, sleep apnea, migraines, and

dysmenorrhea.  Tr. 294.  After denials by the state agency initially (Tr. 114-115) and on

reconsideration (Tr. 148-149), Descott requested an administrative hearing.  Tr. 179.  A hearing

was held before Administrative Law Judge ("ALJ") Cheryl M. Rini on March 3, 2015.  Tr. 47-

87.  In her June 24, 2015, decision (Tr. 22-41), the ALJ determined that there are jobs that exist

in significant numbers in the national economy that Descott can perform, i.e., she is not disabled.

Tr. 39.  Descott requested review of the ALJ's decision by the Appeals Council (Tr. 16) and, on April 12, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Descott was born in 1982 and was 30 years old on the date her applications were filed. Tr. 39, 220, 225.  She has her GED, completed a medical assistant training program, and acquired one year of college credits towards an accounting major.  Tr. 58.  She previously worked as a collections representative and in property preservation.  Tr. 75-78.  She last worked in October 2013.  Tr. 55-56.

### B. Relevant Medical Evidence[1]

On October 26, 2010, at a preventative physical exam with Renee Mapus, M.D., Descott complained of trouble sleeping and daily headaches and her reported history included migraines. Tr. 353-555.  Upon exam, she had a normal mood and affect and was oriented to person, place and time.  Tr. 356.  For her migraines, she was referred to a sleep study and it was recommended she try propranolol for prevention and Tylenol PM for breakthrough headaches.  Tr. 356.

At a follow-up appointment with Dr. Mapus on January 24, 2011, Descott complained of headaches at times and felt that she needed her eyes checked.  Tr. 476.  She again reported that she was not sleeping well.  Tr. 476.  Dr. Mapus wrote that Descott's headaches/migraines were not under great control and that she will have her eyes checked.  Tr. 476.  Her propranolol was refilled.  Tr. 476.

---

[1]  Descott only challenges the ALJ's findings regarding her migraine headaches.  Accordingly, only the medical evidence relating to Descott's migraines are summarized and discussed herein.

On April 7, 2011, Descott returned to Dr. Mapus feeling ill; she was diagnosed with strep throat, prescribed antibiotics, and received a Return to Work certificate stating that she can return to work on April 8, 2011. Tr. 471.

On June 1, 2011, Descott saw Dr. Mapus and reported that the propranolol was helping her headaches but that she was still having them. Tr. 470. She also complained of not sleeping well, having premenstrual problems, and stated that she was not functioning well when she had Premenstrual Dysphoric Disorder (PMDD). Tr. 470. Dr. Mapus restarted her on depo-provera for her menstrual symptoms, noting that this helped similar symptoms previously, and increased her propranolol to 60mg daily to see if it provided better relief. Tr. 470.

On June 7, 2011, Dr. Mapus wrote a letter for Descott stating that she "needed to withdraw from class this semester for medical reasons." Tr. 465.

On August 29, 2011, Descott complained to Dr. Mapus of fatigue and more frequent headaches. Tr. 462. Dr. Mapus noted that she had never had the sleep study she was previously referred for; Dr. Mapus again referred her to a sleep study. Tr. 462. On September 23, 2011, Descott had a polysomnogram (sleep study). Tr. 456-458. Shyam Subramanian, M.D., diagnosed her with REM related obstructive sleep apnea. Tr. 456. Dr. Subramanian recommended conservative measures such as weight loss and a sleep clinic to consider the use of a CPAP machine. Tr. 457.

On April 2, 2012, Descott saw Dr. Mapus for a routine physical exam. Tr. 438-439. Dr. Mapus increased her propranolol dosage to 80mg to see if it optimized control of her migraines. Tr. 439.

On July 13, 2012, Descott established care with Chandra Prakash, M.D., to follow up for hypertension. Tr. 486. Descott reported her history of migraines and stated that she was having

more headaches than usual. Tr. 486. Upon exam, she was alert, cooperative, and pleasant. Tr. 487. She reported that she was unable to tolerate her CPAP machine. Tr. 486. Dr. Prakash explained that sleep apnea can cause headaches to be worse and referred her to sleep medicine. Tr. 487.

Descott returned to Dr. Prakash on August 2, 2012, for a follow-up visit for her hypertension. Tr. 493. She denied headaches. Tr. 493.

On August 22, 2012, Descott saw rheumatologist Rajul M. Desai, M.D., complaining of migraines and sinus and tension headaches, among other things. Tr. 497. Dr. Desai noted that she had not been using her CPAP machine and opined that she needed to be reevaluated for her sleep apnea and managed, because the failure to do so could contribute to a lot of her complained-of symptoms. Tr. 500. Descott understood and stated that she had an appointment with Dr. Craciun in sleep medicine. Tr. 500.

On September 21, 2012, Descott saw neurologist Atanase R. Craciun, M.D., in sleep medicine for her complaints of excessive sleepiness, fatigue, snoring and apneic episodes. Tr. 503. Descott reported that she was not a "shift worker" but that she did work. Tr. 503. She reported migraines and denied difficulty with memory or concentration. Tr. 504, 505. Upon exam, she was pleasant. Tr. 505. Dr. Craciun diagnosed obstructive sleep apnea with chronic fatigue and planned to retitrate her CPAP. Tr. 505.

On February 1, 2013, Descott underwent a CPAP titrate study that recommended a CPAP setting of 12cmH20 with humidification. Tr. 509.

On February 15, 2013, Descott saw Dr. Craciun for a follow-up visit. Tr. 525. She stated that her CPAP machine was helping and she had no difficulties with it. Tr. 525. Dr. Cracium

noted that she responded well to 12 cm H20.  Tr. 525.  Upon exam, Descott was pleasant and oriented to all spheres.  Tr. 525.

On February 28, 2013, Descott reported to a psychological consultative examiner that she experienced headaches, particularly during stressful times.  Tr. 517.  She reported experiencing three to five headaches per week over the past several years.  Tr. 518.  She stated that she took propranolol daily for her migraines and that she used a CPAP machine for her sleep apnea but that it was currently broken.  Tr. 518.  She stated that she was unable to work because she can't sit still and has to move around for her pain; her carpel tunnel made it difficult for her to use a keyboard or computer; and she had no motivation and lacked focus.  Tr. 518.  She described her daily activities: waking up with her alarm at 7:45 a.m. to begin taking care of her grandmother, who has dementia (getting her newspaper, medicine, breakfast); making breakfast for her three children and herself; supervising and assisting her children, who were homeschooled;  after their schooling participating with them performing household chores; preparing dinner and then grading her children's schoolwork from that day and helping them with homework; watching television and then lying down.  Tr. 517, 519.  She manages the family finances and is very social.  Tr. 519.

On April 4, 2013, Descott saw Dr. Prakash for a routine physical; she denied headaches and described her migraines as well-controlled on her medications.  Tr. 527.  On May 8, 2013, Descott again denied headaches to Dr. Prakash.  Tr. 535.  She was still having problems with sleep but she was using her CPAP at night.  Tr. 535.

On June 28, 2013, Descott saw Dr. Craciun for a 4-month follow-up visit.  Tr. 604.  She reported that her CPAP pressure remained 12 cm H20.  Tr. 604.  She complained of sleep apnea and chronic pain and denied any other significant issues.  Tr. 604.

On August 8, 2013, Descott saw Dr. Prakash and denied headaches. Tr. 609. On September 10, 2013, Descott told her psychiatrist, Justin Havermann, M.D., that her headaches "come and go." Tr. 640. She reported being on propranolol for years but was not sure if it was helpful at all. Tr. 640. She had returned to work but reported having difficulties due to motivation, focus, and pain. Tr. 640-642. During the examination, Dr. Havermann observed that she was able to laugh and joke and banter with friends in the waiting room and did not appear to be in significant pain. Tr. 640, 641. He suggested that she discuss with her doctors discontinuing propranolol, taken for migraine prevention, and cyclobenzaprine because they may be interfering with her mood, motivation and focus, especially since she was not sure they were helping her. Tr. 642. He wrote, "Instructed clearly NOT to stop propranolol on her own—this will need to be tapered over time with her doctor." Tr. 642.

On September 30, 2013, Descott saw Dr. Craciun; his impression was "migraine headaches, better." Tr. 625.

On October 18, 2013, Descott went to the emergency room with a headache that she had had for three days; she reported a history of migraines and stated that her psychiatrist had taken her off propranolol. Tr. 655. She stated that her headaches would usually remit after a while with ibuprofen but that this one had not. Tr. 655. She felt like it was one of her regular migraines, "maybe a little worse," and that she was at the emergency room because it had not gone away. Tr. 655. She had some associated nausea and described her pain as moderate, 6/10. Tr. 655. Her physical examination findings were normal. Tr. 657. She was treated with injections of saline, Reglan, Benadryl and Toradol and was discharged with her headache rated as a 1 out of 10 in severity. Tr. 657. She was given prescriptions for Vicodin and Zofran, an anti-nausea medication, but was encouraged not to use the former unless necessary. Tr. 657.

On December 23, 2013, Descott saw Dr. Prakash for a follow-up visit.  Tr. 680.  Dr. Prakash wrote that her migraines had been well-controlled on propranolol but that it had been reduced per her psychiatrist's recommendation.  Tr. 680.  Descott was complaining of more frequent headaches with photophobia and some nausea.  Tr. 680.  Dr. Prakash wrote, "Migraine: worse since she went off the propranolol." Tr. 680.  Dr. Prakash prescribed Verapamil daily to help with her headaches.  Tr. 681.

On November 8, 2013, Descott returned to Dr. Craciun for a follow-up.  Tr. 684.  Dr. Craciun wrote that Descott's headaches were "much better" when she took long-acting propranolol (Inderal) at 80 mg but that she had increasing depression and fatigue.  Tr. 684.  He stopped her propranolol and started her on Depakote.  Tr. 686.  He scheduled neuropsychological testing for her and encouraged her to avoid prolonged computer exposure to prevent triggering headaches and advised that she may need to seek changes in her current work "to something different."  Tr. 684-685.  On November 19, 2013, Dr. Craciun wrote a short letter stating that Descott was under his care for several neurological conditions including migraines; she had noted improvement with the use of medications; further testing to define appropriate treatment was still needed; and that due to her medical conditions she might experience intermittent absences from work.  Tr. 895.  He advised that her next appointment with him was on December 2, 2013, and that they would discuss further treatment and therapy at that time.  Tr. 895.

On December 2, 2013, Descott saw Dr. Craciun for her follow-up visit.  Tr. 883.  Since her last visit, she had had a brain MRI which was normal.  Tr. 883.  Dr. Craciun "strongly suggested that she will pursue the necessary steps for neuropsychological testing."  Tr. 883.  "She is also openly admitting that she has some difficulties with CPAP and I encouraged further compliance and readjustment of the mask and further contacts with the vendor."  Tr. 883.  Upon

7

exam, he described her as a very pleasant lady with a normal exam.  Tr. 883.  Dr. Craciun's impression was obstructive sleep apnea syndrome, migraine headaches with limited control, memory difficulties, and daily headaches.  Tr. 884.  Descott was to remain on Depakote and use volume expanders as necessary.  Tr. 884.  He wrote, "I made it very clear that because of the clustering of headaches, at times, the degree of incapacitations will interfere and will limit her ability to perform that [sic] require norms in her jobs."  Tr. 884.

On April 8, 2014, Descott saw Gabriel Obi, M.D., for a follow-up visit after a fall that injured her shoulder.  Tr. 708.  She reported a history of migraines, including a faint headache at the time of her visit, rated as a 1/10 in severity without nausea.  Tr. 708.  Dr. Obi prescribed promethazine (Phenergan) for her migraines.  Tr. 708.  On June 17, 2014, Descott saw Dr. Obi and denied having a headache.  Tr. 820.

On November 6, 2014, Descott saw Dr. Craciun for a follow-up visit from her last visit almost a year ago, in December 2013.  Tr. 927.  She described a history of migraine headaches that lasted more than ten days that made her miserable and unable to function properly despite her medication.  Tr. 927.  She also complained of coccyx pain that limited her ability to sit and feel comfortable.  Tr. 927.  Dr. Craciun diagnosed her with migraine headaches, coccyx pain, obstructive sleep apnea syndrome, and daily headaches.  Tr. 928.  He prescribed a course of steroids.  Tr. 927.

On November 12, 2014, Descott saw certified a nurse practitioner Lois L. Nicholson for mental health treatment, complaining of depression.  Nicolson noted that Descott was experiencing significant family stressors (her grandmother had moved to assisted living, her husband lost his job, she was not working, one child started counseling and all of them needed it) and that her best friend had moved out of Descott's house and Descott was now driving her

8

"everywhere." Tr. 786.  Nicholson observed that Descott did not look depressed and was happy, laughing, and joking.  Tr. 786-787.  On December 16, 2014, Descott complained to Nicholson of having more headaches.  Tr. 897.  Her mental status exam was normal and Nicholson again commented that she did not look depressed and was happy, laughing, and joking.  Tr. 897.

On February 16, 2015, Descott returned to Dr. Craciun for a follow-up visit.  Tr. 970. She reported "somewhat mixed results" from the steroid course.  Tr. 970.  Dr. Cracium wrote that her headaches were variable, some "clearly related to the night and the sleep as she wakes up with them in the morning.  Cervical pain is part of her complaint as well."  Tr. 970.  She had been using her CPAP machine on a regular basis with no new significant problems.  Tr. 970.  Dr. Craciun discussed the "entirely normal" MRI results and documented a normal examination.  Tr. 970.  His impression was cervicogenic migraines, obstructive sleep apnea syndrome, and daily headaches.  Tr. 970.  He increased her dosage of Zanaflex to twice a day and recommended physical therapy for her cervical spine.  Tr. 971.

## C. Medical Opinion Evidence

### 1. Treating Source

As set forth above, on November 19, 2013, Dr. Craciun wrote a short letter stating that Descott was under his care for several neurological conditions including migraines, she had noted improvement with the use of medications, further testing to define appropriate treatment was still needed, and that due to her medical conditions she might experience intermittent absences from work.  Tr. 895.  He advised that her next appointment with him was on December 2, 2013, and that they would discuss further treatment and therapy at that time.  Tr. 895.

On December 2, 2013, Dr. Craciun reviewed Descott's normal brain MRI findings; noted that Descott admitted that she experienced difficulties with her CPAP machine and advised that

she seek readjustment and practice compliance; commented that she still experienced some limitations in her activities and endurance secondary to this problem; and wrote, "I made it very clear that because of the clustering of headaches, at times, the degree of incapacitations will interfere and will limit [Descott's] ability to perform that [sic] require norms in her jobs."  Tr. 884.

### 2. State Agency Reviewers

On April 25, 2013, state agency physician Frank Stroebel, M.D., reviewed Descott's record.  Tr. 94-96.  Regarding Descotts's residual functional capacity ("RFC"), Dr. Stroebel opined that Descott could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, had frequent and occasional postural limitations, and should avoid all exposure to hazards including heights and machinery.  Tr. 95-96.

On August 7, 2013, state agency physician Sreenivas Venkatachala, M.D., reviewed Descott's record.  Tr. 125-127.  Dr. Venkatachala adopted Dr. Stroebel's opinion and added that Descott could never climb ladders, ropes or scaffolds and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  Tr. 135-136.

### D. Testimonial Evidence

### 1. Descott's Testimony

Descott was represented by counsel and testified at the administrative hearing.  Tr. 50-81.  She explained that she previously worked as a collections representative calling people on the phone to try to get them to pay certain bills.  Tr. 75.  At one point she moved up to a senior collector, a low management position, which required her to supervise eight employees.  Tr. 76-77.  She then switched fields and got into property preservation, which meant working with

banks that had foreclosed homes to ensure that the homes were secure and in good repair.  Tr. 78.  After having issues with her health, she was able to do this work from home from July to October 2013, but then she had to stop work completely because she started having migraines "really bad" and could not return to work per her physician, Dr. Craciun.  Tr. 79.  She stated that Dr. Craciun was working on getting her medications right and did not give an exact return to work date and, thus, her employment had been terminated.  Tr. 79-80.

She testified that the stress of her job was giving her migraines and blurred vision.  Tr. 68.  She was having trouble getting out of bed in the morning, walking two feet to go to her computer, and sitting there for long periods of time.  Tr.  68.  The light coming from her computer monitor bothered her, and lights in an office bothered her as well.  Tr. 68-69.  She will get headaches, pressure in her face, some dizziness, and a very slight ringing in her ears.  Tr. 69.  Even with her medication they do not go away but remain dull.  Tr. 69.  When it gets really bad she has to confine herself to a dark room.  Tr. 69.  This occurs about once every two weeks and usually lasts for three days.  Tr. 69.  She has a CPAP machine that she has been using for about two years.  Tr. 67.

Her property preservation job required her to remember a lot and pay a lot of attention to detail, which she could not do.  Tr. 68.  She was not sure whether her loss of memory was due to her fibromyalgia or her headaches, only that Dr. Craciun told her that she has memory loss.  Tr. 68.  Her fibromyalgia causes extreme pain "pretty much everywhere."  Tr. 70.  She also has mental health issues.  Tr. 73.  She takes medication which sometimes help her mental health improve but then they cause other problems: "They start back with the blurred vision and stuff like that."  Tr. 73.  She also experiences "brain fog" almost every day, where she will zone out for a few minutes.  Tr. 73-74.

11

### 2. Vocational Expert's Testimony

Vocational Expert Adolph Cwik ("VE") testified at the hearing.  Tr. 74, 80-86.  The ALJ discussed with the VE Descott's past relevant work as a collections representative and property preservation technician.  Tr. 80-82.  The ALJ asked the VE to determine whether a hypothetical individual with Descott's age, education and work experience could perform her past work if that person had the following characteristics: can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can stand and/or walk about 6 hours in an 8-hour workday with normal breaks about every 2 hours; can sit for about 6 hours in an 8-hour workday with normal breaks about every 2 hours; can never climb ladders, ropes or scaffolds; can occasionally crawl; can frequently climb ramps and stairs, kneel, stoop, and crouch; must avoid concentrated exposure to fumes, odors, dusts or gases and hazards including work at unprotected heights and commercial driving; can pay attention and concentrate to complete tasks in a work environment that is not fast paced; and can adapt to infrequent and well-explained changes in the workplace.  Tr. 82. The VE testified that such a person could not perform Descott's past work.  Tr. 83.  The ALJ asked the VE if there are other jobs that the person could perform, and the VE testified that the person could perform jobs as an electrical accessories assembler (42,000 national jobs), small parts assembler (87,700 national jobs), and inspector/hand packager (48,600 national jobs).  Tr. 83-84.

Descott's attorney asked the VE to consider whether a hypothetical individual with Descott's age, education and work history could perform work if that individual had the following characteristics: can perform sedentary work with a sit/stand option, defined as needing to stand every 30 minutes for 10 minutes at a time and would be off-task for those 10 minutes; could not perform work on a computer; can frequently handle and finger bilaterally; and can

have no contact with the public and occasional contact with coworkers and supervisors.  Tr. 84-85.  The VE answered that such an individual could not perform work; "the biggest factor is not being on task for 10 minutes when they have to stand," and the computer restriction eliminates a lot of sedentary jobs.  Tr. 85.  Next, Descott's attorney asked the VE whether the same hypothetical individual described above could retain employment if that individual could perform light, unskilled work but would miss two days of work per month on a regular basis.  Tr. 85.  The VE replied that such an individual could not maintain employment.  Tr. 85.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her June 24, 2015, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.  Tr. 24.

2.      The claimant has not engaged in substantial gainful activity since December 13, 2012, the alleged onset date.  Tr. 24.

3.      The claimant has the following severe impairments: fibromyalgia, obstructive sleep apnea, obesity, and depression.  Tr. 25.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 27.

5.     The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §404.1567(b) and 416.967(b) except while the claimant can lift and/or carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday, with normal breaks about every 2 hours; sit about 6 hours in an 8-hour workday, with normal breaks about every 2 hours; she can never climb any ladders, ropes or scaffolds; is unlimited in her ability to balance; occasionally crawl; frequently climb ramps and stairs, kneel, stoop and crouch; has no manipulative, visual or communicative limitations; should avoid concentrated exposure to fumes, odors, dusts or gases; should avoid concentrated exposure to hazards including work at unprotected heights and commercial driving; is able to pay attention and concentrate to complete tasks in a work environment that is not fast-paced; and would be able to adapt to infrequent and well-explained changes in the workplace.  Tr. 31.

6.     The claimant is unable to perform any past relevant work.  Tr. 38.

7.     The claimant was born on April 5, 1982 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 39.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 39.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 39.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 39.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 13, 2012, through the date of this decision. Tr. 40.

## V. Parties' Arguments

Descott objects to the ALJ's decision on two grounds.  She asserts that the ALJ erred when evaluating the opinion of her treating physician, Dr. Craciun, and when she failed to find that migraine headaches were a severe impairment at Step Two.  Doc. 13, pp. 15-24.  In response, the Commissioner submits that the ALJ's evaluation of Dr. Cracium's opinion is supported by substantial evidence and that any purported error at Step Two is not reversible error.  Doc. 16, pp. 6-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not violate the treating physician rule

Descott argues that the ALJ erred when she considered the opinions of her treating physician, Dr. Craciun.  Doc. 13, p. 15.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544

(6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's

opinion less than controlling weight, she must give "good reasons" for doing so that are

sufficiently specific to make clear to any subsequent reviewers the weight given to the treating

physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the

weight given, the ALJ must consider factors such as the length, nature, and extent of the

treatment relationship; specialization of the physician; the supportability of the opinion; and the

consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v.*

*Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ considered Descott's migraine headaches and Dr. Craciun's opinions:

In regards to the migraine headaches on April 4, 2013, the claimant's physician noted that the migraine headaches are well controlled on her current medication and the claimant specifically denied headaches (Exhibit 6F, 4).  On October 18, 2013, the claimant was treated at the emergency room and treated for a migraine and given medication after she stopped taking her regular medication reportedly on the advice of her psychiatrist (Exhibit 12F).  The claimant followed up with her treating physician who prescribed an alternate medication (Exhibit 14F, 18-19) and by November 8, 2013, her physician reported that her headaches were much better, though noted nausea and adjusted the medication (Exhibit 14F, 22).  However, her physician, Dr. Craciun, drafted a letter on November 19, 2013 stating that despite improvement with medications, there was need for further testing to define her diagnosis and that due to her "medical condition" she may experience intermittent absences from her work (Exhibit 19F).  This opinion is given little weight due to the limited frequency as noted in the medical evidence, the lack of significant treatment, the vague nature of the restriction, and significantly, as the "further testing" appears to be a brain MRI which was performed on November 19, 2013 and resulted in "entirely normal findings" with the cerebral spinal fluid (CSF) flow being normal as well (Exhibit 18F, 1; 22F, 37).  On December 2, 2013, the claimant was noted to be tolerating her medication, Depakote, "okay" and a neurological examination was normal with cranial nerves showing primary conjugate gaze and full visual fields, full excursions, no nystagmus, pupils equal and reactive to light, and a normal sensory exam (Exhibit 18F, 2).  The physician noted the migraines were under limited control and opined that because of "clustering of headaches, at times, the degree of incapacitation will interfere and will limit her ability to perform that require norms in her jobs" (Exhibit 18F, 2).[3]  However, again given the lack of support in the medical evidence of such "clustering" headaches and the vague nature of the restriction given the lack of reported

---

[3]  The phrase "limit her ability to perform that require norms in her jobs" is as written in the medical record by Dr. Craciun.  Tr. 884.

frequency of the symptoms, the opinion is given little weight.  In April 2014, the claimant again complained of a migraine and reported a faint headache of 1 out of 10 presently and was treated with medication (Exhibit 16F, 16).

On November 6, 2014, Dr. Craciun noted the claimant was complaining of daily headaches and that she was miserable and unable to function properly (Exhibit 21F). However, the claimant's other treatment records are inconsistent with this level of decreased functioning and is inconsistent with the reported frequency and duration of this pain.   In November 2014, the claimant exhibited normal behavior, a cooperative attitude, normal thought content, logical thought process, good recent and remote memory, good judgment, fair insight and intact cognition on a mental status exam (Exhibit 17F, 61). The claimant also reported she was driving her best friend everywhere, which I note appears inconsistent with reports of daily severe migraine headaches lasting more than 10 days as alleged to Dr. Craciun (Exhibit 17F, 69; 21F).  On November 12, 2014, the claimant's mood was noted to be euthymic with a congruent affect, insight was improved to good, and again with good memory, normal behavior and a cooperative attitude and was observed to be happy, laughing and joking (Exhibit 17F, 70).  On December 16, 2015, Dr. Craciun noted the claimant's reports of cervical pain, and changes his diagnosis to cervicogenic migraines and daily headaches, however a physical exam noted the neck was supple, peripheral joints showed no acute or chronic changes, a neurological exam was generally normal with pupils equal and reactive to light, motor and sensory exams were normal and there is no evidence that the physician ordered imaging or further treatment for cervical spine complaints (Exhibit 22F).  Taking into account the claimant's reported activities which are inconsistent with the alleged headaches, and noting the normal MRI, limited physical examination findings, and lack of support and complaints in the contemporaneous medical records, I find that there is no evidence to support that the claimant's alleged migraine headaches more than minimally limit the claimant's ability to perform basic work activities; therefore, for the purposes of this decision, and therefore are "non-severe."

Tr. 26-27.

Descott argues that the ALJ's reasons were not "good reasons."  Doc. 13, p. 18.  She contends that there is substantial evidence in the record showing that, contrary to the ALJ's statement, her headaches were longstanding, i.e., not infrequent, and she had significant treatment, including an emergency room visit and seven prescribed medications.  Doc. 13, pp. 18-19.  However, she ignores the ALJ's explanation: in April 2013 her physician described her headaches as well-controlled with medication; her emergency room visit occurred in October 2013, after she had stopped taking her prescribed medication that had helped prevent migraines

(propranolol); she was started on an alternate medication; and she was found by Dr. Craciun to have limited control of her migraines thereafter.  Tr. 26.  The ALJ observed that, despite having only limited control of her migraines on alternative medication, she was not observed by other providers to have debilitating pain.  Tr. 26.  The ALJ commented that Descott's activities of daily living belied the debilitating nature of her migraines that she reported to Dr. Craciun (severe migraines lasting 10 days in November 2014).  The ALJ described in detail in her decision the contrast between Descott's complaints to Dr. Craciun of severe headaches lasting 10 days and being miserable and unable to function and her contemporaneous activities of driving her friend "everywhere" and being observed by her mental health provider to be happy, laughing, and joking.  In addition, Descott homeschooled her three children, one of whom has attention deficit hyperactivity disorder; she cared for her grandmother, who has dementia; she prepared meals for herself and her children; she performed household chores and kept herself and her house tidy; and in September 2014 she reported coaching cheerleading three days a week.  Tr. 26, 28-29.  The ALJ did not find Descott's alleged limitations to be entirely credible.  Tr. 32.  As for treatment, the ALJ discussed Descott's medications and, elsewhere in her decision, observed that Descott had been non-compliant with her CPAP machine and that non-compliance caused her to have headaches.  Tr. 26, 34.  Descott also did not follow up with Dr. Cracium's recommended neuropsychological examination.  Tr. 33.  The ALJ commented that Descott's brain MRI was normal, as were physical exam findings, and that Dr. Craciun later changed her diagnosis to cervicogenic migraines based on her complaints of cervical pain, despite a normal neck exam.  Tr. 26.  Of the seven medications identified by Descott as having been prescribed to her (Doc. 13, p. 19), two are the same medication (propranolol and Inderal); three were given in the emergency room after she stopped taking propranolol (Toradol, Reglan, and Benadryl) (Tr.

657); promethazine was for migraine-induced nausea, to take as needed (Tr. 708-709); and Zanaflex was prescribed for her coccyx pain (Tr. 928).  Lastly, the ALJ accurately observed that Dr. Craciun's restrictions were "vague": one stated that she "may experience intermittent absences from her work" due to her "medical condition" and the other stated that the degree of her incapacitation due to "clustering of headaches, at times," will interfere with her ability to perform her current job.  Tr. 895, 884.  Notably, the ALJ found that Descott was unable to perform her past relevant work.  Tr. 39.

In sum, the ALJ did not violated the treating physician rule.  She considered whether Dr. Craniun's opinions were well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, provided good reasons for giving "little" weight to Dr. Craniun's opinions, and her conclusion is supported by substantial evidence.  *See Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527; *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).  Descott essentially asks this Court to reweigh the evidence, which the Court cannot do.  *See Garner*, 745 F.2d at 387.

### B. The ALJ did not err at Step Two

Descott argues that the ALJ erred when she did not include her migraine headaches as a "severe impairment" at Step Two.  Doc. 13, p. 20.  The Court disagrees.  As Defendant submits, the ALJ found that Descott suffered from other severe impairments at Step Two (fibromyalgia, obstructive sleep apnea, obesity, and depression) and continued through each step in the sequential evaluation process; thus, the ALJ's failure to include migraine headaches as a severe impairment at Step Two, even if error, is not reversible error.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (The Secretary's failure to find that a

claimant's condition was a severe impairment at Step Two was not reversible error because the Secretary found the claimant to have other severe impairments at Step Two and continued with the sequential evaluation process; thus, she could consider the claimant's non-severe impairments when assessing whether the claimant retained the residual functional capacity to perform substantial gainful activities).

## VII. Conclusion

For the reasons state above, the Commissioner's decision is **AFFIRMED**.


Dated: March 20, 2017

Kathleen B. Burke
United States Magistrate Judge